IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:11-HC-2074-F

DERRICK MONTRIAL HARPER,          )
                                  )
              Petitioner,         )
                                  )
      v.                          )          ORDER
                                  )
ROBERT JONES, Administrator,      )
Pasquotank Correctional Institution,  )
                                  )
              Respondent.         )

This matter arises from the petition for writ of habeas corpus [D.E. # 1], pursuant to 28

U.S.C. § 2254, filed by Derrick Montrial Harper ("Harper" or "petitioner"). Petitioner is a state

inmate under sentence for convictions on two counts of first degree murder. Presently before the

court is respondent's motion for summary judgment [D.E. # 5]. For the reasons that follow, the court

orders that respondent's motion for summary judgment will be granted.

## STATEMENT OF THE CASE

I.      Background

Harper was convicted on September 1, 2005, in the Superior Court of Edgecombe County.

The following brief summary of the evidence presented at his trial is taken from the opinion of the

North Carolina Court of Appeals affirming the conviction in State v. Harper, 179 N.C. App. 654, 635

S.E.2d 72, 2006 WL 2807937 (N.C. Ct. App. Oct. 3, 2006) (unpublished table decision).

> The State adduced eyewitness testimony describing defendant shooting to death two
> individuals on 23 May 2004 outside the Club Hypnotize at the intersection of

1

Thigpen Road and Factory Street in Conetoe, North Carolina. Eyewitnesses testified that defendant shot the victims and immediately fled from the scene. Testimony was also presented describing defendant's disposal of the murder weapon. A jury found defendant to be guilty of two counts of first-degree murder. The trial court sentenced defendant to two concurrent terms of life imprisonment without possibility of parole.

2006 WL 2807937, *1.

II.  Procedural History

Petitioner appealed the convictions to the North Carolina Court of Appeals. Petitioner's counsel was "unable to identify any issue with sufficient merit to support a meaningful argument for relief," and therefore sought review pursuant to Anders v. California, 386 U.S. 738 (1967). Id. The Court of Appeals held as follows: "In accordance with Anders, we have fully examined the record on appeal to determine whether any issues of arguable merit appear therein. The record on appeal is insufficient to review, and we neither address nor rule on, whether defendant received effective assistance of counsel at trial. We find no error in the judgments of the trial court in the record before us." Id. Accordingly, the court affirmed petitioner's convictions. Id.

On September 27, 2007, petitioner filed a motion for appropriate relief ("MAR") in the Superior Court alleging claims of ineffective assistance of trial counsel. The state court did not conduct an evidentiary hearing before issuing an order summarily denying the MAR on August 14, 2008. Petitioner thereafter filed a request for certiorari with the North Carolina Court of Appeals. On September 3, 2008, the Court of Appeals entered an order vacating the Superior Court's summary order and remanding for an evidentiary hearing.

The Superior Court conducted the evidentiary hearing on October 7, 2010, and entered an order again denying the MAR on March 2, 2011. Harper's petition for certiorari review of this judgment was denied by the North Carolina Court of Appeals on April 14, 2011. On April 20, 2011,

2

petitioner filed the instant federal petition for writ of habeas corpus and supporting exhibits. On November 7, 2011, respondent filed his motion for summary judgment and supporting memorandum. Petitioner has not filed a response to the motion for summary judgment. The matter is now ripe for ruling.

## DISCUSSION

I.    Standard of Review

A.    Summary Judgment

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp, 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B.    Section 2254(d)

The court's review of Petitioner's claims is governed by 28 U.S.C. § 2254(d), as modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104, 132, 110 Stat. 1214 (1996). Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

3

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The phrase "'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decisions." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 412-13. A state court decision "involve[s] an unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Likewise, under § 2254(d)(2), "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. __, __, 130 S.Ct. 841, 849 (2010). See also Winston v. Kelly, 592 F.3d 535, 554 (4th Cir. 2010) ("For a state court's factual determination to be unreasonable under § 2254(d)(2), it must be more than merely incorrect or erroneous. It must be sufficiently against the

weight of the evidence that it is objectively unreasonable.") (citing <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007)). Thus, while "deference [in the habeas context] does not imply abandonment or abdication of judicial review" and does not "preclude relief," <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003), the deferential standard imposed by § 2254(d), as to both legal conclusions and factual determinations by the state courts, erects a substantial bar for state inmates seeking habeas relief in federal court.[1]

The statute "does not require that a state court cite to federal law in order for a federal court to determine whether the state court decision is an objectively reasonable one." <u>Bell v. Jarvis</u>, 236 F.3d 149, 160 (4th Cir. 2000). If the state court did not articulate the rationale underlying its adjudication, a federal habeas court must examine the record and the clearly established Supreme Court precedent to determine whether the state court's adjudication was contrary to, or involved an unreasonable application of, clearly established federal law. <u>Id.</u> at 158. "When a federal claim has

---

[1]     In this vein, the Supreme Court recently observed as follows:

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. <u>Cf.</u> <u>Felker v. Turpin</u>, 518 U.S. 651, 664 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no probability fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. <u>Jackson v. Virginia</u>, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

<u>Harrington v. Richter</u>, 562 U.S. __, __, 131 S.Ct. 770, 786-87 (2011).

5

been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington, 562 U.S. at __, 131 S.Ct. at 784-85. Finally, the factual findings of the state court are presumed to be correct. 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of rebutting this presumption by clear and convincing evidence. Fisher v. Lee, 215 F.3d 438, 445 (4th Cir. 2000).

Only after a petitioner establishes that the state court's adjudication of his claims was "contrary to" or an "unreasonable application of" clearly established federal law, or was "based on an unreasonable determination of the facts in light of the evidence," may a federal court proceed to review a state court judgment independently to determine whether habeas relief is warranted. Rose v. Lee, 252 F.3d 676, 689-90 (4th Cir. 2001). See also Frazer v. South Carolina, 430 F.3d 696, 718 (4th Cir. 2005) ("Because the state court's decision in this case was both contrary to and involved an unreasonable application of clearly established federal law, the district court properly reviewed Frazier's claim *de novo*."); Lynch v. Polk, 204 F. App'x 167, 170 (4th Cir. 2006) (unpublished decision) ("If a legal or factual error of the degree specified in § 2254(d)(1) or (d)(2) occurred, then a federal court has the obligation to conduct an independent review of the petitioner's claims to determine whether the issuance of a writ is warranted.").

II.     Petitioner's Claims

Petitioner asserts that he is entitled to habeas corpus relief pursuant to § 2254 because his attorney rendered ineffective assistance of counsel at his trial when he failed to "present readily available evidence to rebut the State's theory of motive" and further failed to "present readily available evidence of third party guilt." Pet. 10,11.

6

III.    Analysis

Respondent does not contend that petitioner has failed to exhaust his claims in the state

courts, and neither party asserts that the state courts failed to decide petitioner's claims on their

merits. Thus, in accordance with 28 U.S.C. § 2254(d), this court must determine whether the state

court's adjudication of petitioner's claims was contrary to, or involved an unreasonable application

of, clearly established federal law, or was based on an unreasonable determination of the facts

adduced in state court.

Petitioner's claims are premised on his assertion that trial counsel rendered ineffective

assistance at his trial, in violation of his rights under the Sixth Amendment to the United States

Constitution, as explicated in Strickland v. Washington, 466 U.S. 668 (1984). Thus, it is appropriate

at this juncture to set forth the standards governing the court's analysis of such claims. The United

States Court of Appeals for the Fourth Circuit recently described these standards as follows:

> To demonstrate ineffective assistance of counsel, Petitioner must show "that
> counsel's performance was deficient, and that the deficiency prejudiced the defense."
> Wiggins v. Smith, 539 U.S. 510, 521 (2003). Regarding the first prong, a "deficient"
> performance is one that falls "below an objective standard of reasonableness." Id.
> at 511. Petitioner must show "that counsel made errors so serious that counsel was
> not functioning as the counsel guaranteed . . . by the Sixth Amendment." Harrington,
> [562 U.S. at __], 131 S.Ct. at 787 (internal quotations marks omitted). See also
> Strickland v. Washington, 466 U.S. 668, 687 (1984) ("First, the defendant must show
> that counsel's performance was deficient. This requires showing that counsel made
> errors so serious that counsel was not functioning as the 'counsel' guaranteed the
> defendant by the Sixth Amendment.").
>
> [A court's] deferential assessment of counsel's performance must "include
> [] a context-dependent consideration of the challenged conduct as seen from
> counsel's perspective at the time . . . ." Wiggins, 539 U.S. at 523 (internal quotation
> marks omitted). Further, we must resist the temptation to "second-guess counsel's
> assistance after conviction or adverse sentence" and make "every effort . . . to
> eliminate the distorting effects of hindsight." Strickland, 466 U.S. at 689. Indeed,
> we must review with "scrupulous care, lest intrusive post-trial inquiry threaten the

7

integrity of the very adversary process the right to counsel is meant to serve." Harrington, [562 U.S. at __], 131 S.Ct. at 788 (internal quotation marks omitted).

Decastro v. Branker, 642 F.3d 442, 450 (4th Cir. 2011).

As to the second Strickland prong, prejudice, petitioner must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. Thus, petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 688. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. This showing "requires a substantial, not just conceivable, likelihood of a different result." Cullen v. Pinholster, 563 U.S.__, __, 131 S.Ct. 1388, 1403 (2011) (internal quotations omitted). "The totality of the evidence before the judge or jury must be considered in making this determination." Williams v. Ozmint, 494 F.3d 478, 484 (4th Cir. 2007) (internal quotation marks omitted).

In Harrington, the Supreme Court discussed the interplay of the Strickland ineffectiveness standard and the deferential review standard of AEDPA when a habeas petitioner alleges ineffective assistance of counsel.

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Williams, *supra*, at 410. A state court must be granted deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
> . . .
> "Surmounting Strickland's high bar is never an easy task." Padilla v.

8

Kentucky, 559 U.S. __,__, 130 S.Ct. 1473, 1485 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." Id. at 689; see also Bell v. Cone, 535 U.S. 685, 702 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. Strickland, 466 U.S., at 690.

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," id., at 689; Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997), and when the two apply in tandem, review is "doubly" so, Knowles[ v. Mirzayance, 556 U.S. __, __, 129 S.Ct. 1411,1420 (2009)]. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at __, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington, 562 U.S. at __, 131 S.Ct. at 785, 788 (emphasis in original).

A.     Claim I

In Claim I, petitioner argues he received the ineffective assistance of counsel due to his

attorney's failure to present testimony or other evidence challenging the State's theory of motive.

Petitioner argues as follows:

the state's theory was that Mr. Harper began shooting because he was angry that people were beating up his cousin.[2] There is a major flaw with that theory: Mr.

---

[2]  In pertinent part, several of the State's witnesses at trial cumulatively testified that when a fight involving Derrick Freeman and several of the "East Tarboro Boys" broke out in the parking

(continued...)

9

> Harper and Mr. Freeman [the victim of the beating which precipitated the shooting]
> are not related. More importantly, they were not friends and, in fact, they were on
> bad terms with one another.

Pet. 10-11. In support of his contention that the State's theory of motive was false, petitioner cites to the testimony at the MAR hearing of his brother and sister, both of whom testified that Freeman is not petitioner's cousin, that they were not friends, and, moreover, that petitioner did not like Freeman because Freeman fathered a child with petitioner's sister but had refused to acknowledge paternity. Id. at 11. Thus, petitioner asserts, "[g]iven the nature and history of their relationship, it was extremely unlikely that Mr. Harper would come to Mr. Freeman's defense in a fist fight." Id. Respondent maintains that petitioner's counsel did not render ineffective assistance and that the state court's decision denying this claim is not contrary to or an unreasonable application of clearly established federal law, nor based upon an unreasonable determination of the facts in light of the evidence produced during state court proceedings. Resp.'s Supp. Mem. [D.E. # 6] 9-10.

At the MAR hearing, petitioner's counsel testified that he knew petitioner and Freeman were not actual cousins, and that, indeed, they were not friends. MAR Tr. 177-78, ex. 6 to Pet. [D.E. # 1-7]. During cross-examination, he explained his understanding of a possible colloquial meaning of the word "cousin" as it was used by witnesses, and described his efforts as follows:

> Q.   And you know that Mr. Harper is not related to Mr. Freeman in any
>      way.
> A.   I do.
> Q.   Right. And were you aware –
> A.   Well, I mean, not related, not blood related, but there was on the

---

[2](...continued)
lot at the Club Hypnotize, petitioner brandished a firearm, asked who was fighting his "cousin," and began shooting. See Trial Transcript ("Tr.") 37 (testimony of Demetric Davis), 102 (testimony of Dontelvious Thigpen), 294-95 (testimony of Terrence Hyman), and 322-25, 336 (testimony of Calvin Battle).

|   | streets that could be related. I mean, the fact that his sister and Mr. Harper–Mr. Harper's sister and he had a child together. |
| Q. | Did you ever talk with Mr. Harper about his relationship with Mr. Freeman? |
| A. | Uh-Huh (Yes). I know that Mr. Harper, according to Mr. Harper, that they didn't get along. I had that information and I was trying to elicit that through Marquis Higgs who touched on it in his testimony but he did not go into as strong as I would have liked.[3] |
| Q. | And what Mr. Hicks said was that they were not, quote, kin but they did associate, right? |
| A. | Correct. |
| Q. | And later on you put on Tameka Burton who testified that she was kin to Mr. Harper -- excuse me, strike that. Did you ever talk to Derrick's brother and sister to find out, particularly, the sister who had had the child with Mr. Freeman what her relationship with Mr. Freeman was like. |
| A. | I don't recall. But I was clearly aware that there was evidence that Mr. Harper didn't care for Mr. Freeman and it would have refuted the state's theory that he was trying to protect Derick Freeman. |
| Q. | It totally undercuts their theory of why he came out of that club shooting someone. |
| A. | Correct. |
| Q. | And you would agree after hearing the testimony now that there witnesses available at that time who could have testified -- |
| A. | There were. And Marquis Higgs was supposed to be the one to do that and he did not do a very good job of going into that like wanted him to. |
| Q. | Well, you had an opportunity to call other witnesses -- |

---

[3]    After the State presented its case at trial, petitioner's counsel delivered his opening remarks and disputed the State's implicit assertion that petitioner and Freeman were cousins: "You're going to also hear that Derrick Harper knew Derrick Freeman, had known him for a long time, but were not good friends, were not cousins, and were not even in the same age group, and didn't hang together." Tr. 442-43. Subsequently, Marques Higgs testified as follows:

| Q. | And do you know if Derrick Freeman is any kin to Derrick Harper? |
| A. | No, they're not related. |
| Q. | Do you know if they're friends? |
| A. | I mean, they associate, but not really like I wouldn't say friends. They associate because they live in the same trailer park. But it's two different age levels, you know. He's a kid. |

Tr. 493.

| A. | I did. |
|----|--------|
| Q. | -- when you realized he hadn't done that, right? |
| A. | I did. |
| Q. | And, again, you agree that that was their key theory in this why they say he was involved in a shooting. |
| A. | Well, I mean, obviously, the motive is a key theory, but it still didn't get me beyond the eyewitnesses. |

Id. 178-80. After hearing petitioner's evidence and counsel's testimony at the MAR hearing, and after considering post-hearing briefing submitted by the parties, the state court determined, in pertinent part, that "the decisions made by Defendant's trial counsel referenced by Defendant's MAR were strategic ones and not due to neglect or inattention, and further finds that Defendant's trial counsel was not so ineffective as to deny the Defendant his 6th Amendment right to counsel." Order Denying MAR 2, ex.9 to Pet. [D.E. # 1-11]. Moreover, the court concluded, "a different result at trial would not have been reasonably probable had counsel acted as the MAR suggests." Id.[4]

The state court's decision is neither contrary to nor an unreasonable application of clearly established federal law, and is not based upon an unreasonable determination of the facts in light of the evidence before that court. Counsel clearly was aware of the kinship discrepancy now raised by petitioner, and he obviously perceived some value in attempting to develop that evidence before the jury. The fact that the witness counsel relied upon to establish this fact did not testify as forcefully as counsel might have hoped does not render counsel ineffective in failing to present other witnesses that would have, at most, only amplified the testimony of Marques Higgs. At bottom, the jury was informed that, contrary to the implication provided by the State's witnesses, petitioner and Freeman

---

[4] Because this claim was denied on the merits by the MAR court and the North Court of Appeals declined to exercise discretionary review of the claim, the MAR court's ruling is the relevant state court decision for purposes of applying § 2254(d). See Frazer, 430 F.3d at 706 n.7; id. at 726-727 (Luttig, J., dissenting) ("Under no circumstance can a discretionary denial of certiorari be relevant to the inquiry mandated by section 2254(d).").

were not cousins and, moreover, were not even friends. Had petitioner's brother or sister also testified about any potential animosity between petitioner and Freeman over the paternity dispute involving petitioner's sister, it is not reasonably likely that the jury would have reached a different verdict. In fact, had counsel adduced testimony establishing that petitioner knew Freeman was the father of his sister's child, the jury reasonably may have concluded that, notwithstanding any dispute about paternity, petitioner might have been more inclined to protect Freeman for any possible future benefit of his sister and her child. In any event, the state court's conclusion that petitioner did not receive the ineffective assistance of counsel with respect to this claim is neither contrary to or an unreasonable application of clearly established federal law, nor is it based upon an unreasonable determination of the facts in light of the evidence before the court. Thus, respondent is entitled to summary judgment on this claim.

B.     Claim II

Petitioner's second claim is that counsel was ineffective in failing "to fully investigate and present evidence that other persons had stated shortly after the incident that they were responsible for the shootings." Pet. 11. Specifically, petitioner states:

> Those men explained how they did the shooting (with two guns), why they did the shooting (because of an earlier incident involving the victims), and how they escaped (through a path in the woods across from the club). Defense counsel's investigator, Jerry Waller, uncovered some of this information for counsel early in the case. However, counsel did not ask Mr. Waller to investigate the matter further.

Pet. 11. The evidence of other shooters which petitioner faults counsel for failing to present stems primarily from the testimony of five persons at the state court hearing on petitioner's MAR: Kentae Knight, Catresha Murphy, Shonkite Thigpen, Trevor Howard, and Shontae Farmer.

At the MAR hearing, Kentae Knight testified about his observations on the day and evening

13

of the shooting for which petitioner was convicted. He testified that earlier in the day he had hosted a birthday party for his daughter and that a man named Terry Andrews visited the party with a number of other men from the area. MAR Tr. 31-33. Andrews told Knight about an incident which occurred earlier that day, in which Andrews and the men were involved in an altercation in East Tarboro wherein Andrews was spat upon by Anthony Williams, one of the victims of the shooting at the club, and the vehicle carrying the men was hit with gunfire. Id. According to Knight, Andrews was agitated and remarked that he would see those guys again. Id. at 34. Knight also testified that he was at the club at the time of the shooting, and that he never saw petitioner with a gun at the club. Id. at 37. During cross examination, Knight admitted that he had met with petitioner's trial counsel prior to trial and told him about the matters to which he testified at the hearing. Id. at 44. He also admitted that he did not witness the shooting itself and could not offer any testimony that "would dispute what the state's four eyewitnesses" testified to at trial. Id. at 50.

Catrisha Murphy also testified at the MAR hearing. Murphy was a friend and former paramour of petitioner's who was corresponding with petitioner by letter after his arrest. MAR Tr. 68. Murphy testified about a conversation she had with a man named Terrell Cherry in July, 2004. Murphy explained that she was pregnant and attending a party at a trailer when Cherry, who had been drinking, approached her and begun discussing the shootings at the club. Id. at 70-71. According to Murphy, Cherry claimed that he and Terry Andrews were in the woods near the club shooting, and that they left the scene through a path in the woods. Id. Murphy testified that Cherry claimed to have been shooting a .22 caliber handgun. Id. at 71. Rather than contacting the police, Murphy wrote petitioner to tell him about the conversation. Id. During cross examination, Murphy admitted that she believes Cherry was likely boasting, "just talking to get cool points" because "[h]e

14

was liking my cousin." Id. at 74-75.

Shonkita Thigpen also testified at the MAR hearing. Thigpen is Murphy's cousin and was present at the July, 2004, party with Murphy and Cherry. MAR Tr. 69, 70-71. Thigpen is also petitioner's cousin. Id. at 82. Thigpen observed Cherry's statement that he and Terry Andrews were firing guns from the woods at the club. Id. at 84-85. During cross examination, however, Thigpen admitted that she was under the influence of illegal drugs at the party and was "high as hell." Id. at 88.

Trevor Howard testified that he is an old acquaintance of petitioner's, and that he was at Club Hypnotize on the night of the shootings. MAR Tr. 90. He testified that he heard two different guns being fired, one small caliber and one larger caliber. Id. at 92. Howard testified that some time after the shooting he was drinking with Terry Andrews and Andrews gave him a .22 caliber firearm to keep in his house. Id. at 93, 94. Howard testified that Andrews stated the firearm had been "in Conetoe that night," which Howard interpreted as an admission that the firearm had been used in the Club Hypnotize shooting. Id. During cross examination, Howard admitted that he did not see who shot the victims. Id. at 96-97.

Shontae Farmer testified that she was dating one of the victims at the time of the shooting, but that she had dated Terry Andrews both prior to the shooting and again after the shooting. MAR Tr. 99-100.

According to petitioner, this testimony presented at the MAR hearing cumulatively shows that others were responsible for the shootings, those shooters had a motive to carry out the shootings, and one of those shooters admitted his involvement under while relaying details which corroborate his involvement.

15

In rebuttal, the State presented the testimony of Terry Andrews and Terrell Cherry at the MAR hearing. Andrews testified that he was attending a "welcome home party" celebrating his release from the Department of Corrections at Club Hypnotize on the night of the shootings. MAR Tr. 121. He testified that, at the time of the shooting, he was inside the club fighting. Id. at 122. Andrews admitted to knowing Cherry and one of the victims, Anthony Williams. Id. Andrews also acknowledged the spitting and shooting incident from earlier in the day in East Tarboro. Id. at 122-23. During cross examination, Andrews admitted that he gave Howard a firearm sometime after the shootings, but he testified that it was a .25 caliber firearm rather than a .22. Id. at 127. Cherry denied that he attended a party with Murphy and Thigpen and denied that he confessed his involvement in the shooting to Murphy and Thigpen. Id. at 136. During cross examination, Cherry testified that he and Andrews were associates in May of 2004, that he was at Club Hynotize on the night of the shootings, and that his house was within walking distance of the club. Id. at 138-40.

Petitioner's trial attorney, Thomas Moore, also testified at the MAR hearing. Moore testified generally about how he goes about formulating a trial strategy, and what was his overarching strategy for petitioner's trial. MAR Tr. 143-47. Moore concentrated on rebutting the physical evidence the State intended to introduce at trial while also demonstrating the inconsistencies in the testimonies of the State's eyewitnesses. Id. He devoted considerable effort to preparing his cross examination of the four state witnesses who would testify that his client shot the victims or brandished a firearm prior to the shootings. Id. at 153-55. He also elicited testimony at trial from Marquise Higgs that petitioner was not the shooter and that there were two different firearms being discharged. Id. at

16

157.[5] Moore acknowledged that he was familiar with the statements that Murphy and Thigpen gave his investigator concerning Terrell Cherry's purported confession. Id. at 151. However, Moore questioned the accuracy of the statements because evidence that shooters were firing from a nearby wooded area conflicted with physical evidence regarding the location of the spent shell casings found by law enforcement, as well as evidence that one of the victims was running away from the club to escape the shooter. Id. at 152. He knew that Cherry and Andrews would deny or refuse to testify about any involvement in the shootings, and he was concerned that the judge would not admit the testimonies of Murphy or Thigpen because it was hearsay. Id. at 158, 160. Thus, Moore focused his pretrial preparation demonstrating flaws in the State's investigation as well as inconsistencies in the testimony of key witnesses.

On cross examination, Moore testified that he could not recall specifically instructing his investigator to further investigate the stories of Knight, Murphy, and Thigpen, regarding the incidents involving Terry Andrews in East Tarboro and the Cherry confession. Id. at 168-69. He also did not recall whether he conducted specific research into the admissibility of Murphy's and Thigpen's testimonies. Id. at 171-72. He testified that he "made the decision that I could not get that in and I don't remember what went through my mind that made me not do that, but it was a strategic decision based on all the information I had at the time. Some of that is documented and some of it not." Id. at 175. Ultimately, Moore believed that he would not be able to get Murphy's and Thigpen's testimonies into evidence and, even if he could, he did not find them reliable. Id. at 176.

After hearing all of this evidence and considering the parties' briefing on this claim, the state

---

[5] At trial, Higgs testified that he heard five shots that night and that he was able to discern that the shots came from both large caliber and small caliber guns. Tr. 496-97.

court made the following findings of fact:

> Counsel reviewed evidence in Defendant's case, employed a private investigator, interviewed multiple witnesses before trial and formulated a trial strategy, to wit, attacking the inconsistencies in the State's eyewitness testimony. To that end, counsel filed a Motion to Sequester said witnesses, which was allowed. Counsel thoroughly examined all of the State's witnesses.

> On the Defendant's behalf, counsel presented evidence through a witness, Marquis Higgs, that multiple guns were fired on the night of the crime.

> The statements of Antrelle Higgs and Kentae Knight were known to counsel before trial; counsel considered the relative strengths and weaknesses of calling each or both as witnesses, and made a considered strategic decision not to call them as witnesses.

> The statements of Catresha Murphy and Shonkita Thigpen, about admissions they allegedly overheard from Terry Andrews and Terrell Cherry regarding the night of the crime, were known to counsel before trial. Counsel considered the relative admissibility of the evidence in said statements and made a considered strategic decision not to call Murphy or Thigpen as witnesses.

Order Denying MAR 2, ex. 9 to Pet. [D.E. # 1-11]. Based upon these findings, the state court determined "that the decisions made by Defendant's trial counsel referenced by Defendant's MAR were strategic ones and not due to neglect or inattention" and that "Defendant's trial counsel was not so ineffective as to deny the Defendant his 6th Amendment right to counsel." Id. The court also found that "a different result would not have been reasonably probable had counsel acted as the MAR suggests." Id.

Petitioner faults counsel for failing to offer the evidence adduced at the MAR hearing during petitioner's trial:

> The information regarding the run in Andrews had with the [East Tarboro Boys] was provided to defense counsel within a matter of a few weeks of the shooting. This was a case that begged for a thorough investigation for alternative suspects. Even with no further investigation, trial counsel had ample evidence that he could have presented at trial to create a reasonable [doubt] that Mr. Harper was innocent and that Cherry and Andrews were the real killers. There simply is no

18

constitutionally justifiable tactical or strategic reason for failing to present a client's best defense. The best defense in this case was to show that Andrews and Cherry were the real killers.

In addition to failing to order further investigation, counsel did not attempt to use the evidence that Waller had discovered at trial. Evidence of other persons being involved in the shooting was not inconsistent with the defense of misidentification and would have meshed well with the defense at trial.

. . .

If the jurors had known that other people had admitted having the motive, means, and opportunity to commit the killings there is a reasonable probability that the jury would have had a reasonable doubt as to Mr. Harper's guilt.

Pet. 15, 16. Thus, petitioner appears to contend that his attorney was deficient due to both a failure-to-adequately-investigate and his decision not to present evidence of which he was aware due to the investigation which he did conduct. On the specific question confronting this court–the application of § 2254(d) to the state court's decision on this claim–petitioner asserts that the state court's "findings are unreasonable in light of the record. Trial counsel's failure to use readily available evidence to discount the state's theory, and to show why another theory was more plausible is simply inexcusable." Pet. 19. Petitioner also argues that the "state court unreasonably applied the Supreme Court decision in Strickland v. Washington in denying Petitioner's claim." Pet. 26.

Petitioner is correct that the Supreme Court's Strickland decision is the clearly established federal law with which the state court was tasked with applying in deciding this claim. Elmore v. Ozmint, 661 F.3d 783, 856 (4th Cir. 2011). The mechanics of a court's application of the multi-pronged Strickland standard was discussed previously in this order and need not be here repeated. However, Strickland also provides specific guidance for a court's consideration of the type of claim presented by petitioner. Strickland addresses counsel's obligations in investigating the defendant's case as a predicate to formulating trial strategy:

strategic choices made after thorough investigation of law and facts relevant to

19

plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91. Thus, clearly established federal law inherently recognizes that "[t]here comes a point where a defense attorney will reasonably decide that another strategy is in order, thus 'making particular investigations unnecessary.'" Cullen, 131 S.Ct. At 1407 (quoting Strickland, 466 U.S. at 691). A court reviewing counsel's judgment in conducting an investigation and deciding among trial strategies is concerned not with what is "prudent or appropriate, but only what is constitutionally compelled." United States v. Cronic, 466 U.S. 648, 665 n.38 (1984).

Petitioner expends considerable effort arguing that his counsel rendered deficient performance in failing to adequately investigate. See Pet. 12 ("Neither attorney every [sic] requested that Mr. Waller follow up on the information provided by Mr. Knight or Ms. Murphy."); id. at 15 ("In addition to failing to order further investigation . . . "); id. at 20-26 (discussing case law concerning counsel's duty to investigate). However, other than Howard's statement about receiving a gun from Andrews, petitioner fails to disclose what evidence additional investigation by counsel could have uncovered for use at trial. Through the investigation he did conduct or manage, counsel certainly knew that petitioner and Freeman were not cousins or even friends, that Murphy and Thigpen were implicating Cherry and Andrews in the shootings due to Cherry's purported "confession," and that Andrews had been involved in an altercation with one of the victims earlier in the day in East Tarboro. These "facts" are the rudiments of petitioner's claim. Thus, it appears

20

that petitioner is primarily aggrieved not with counsel's purported failure to adequately investigate, but, rather, with counsel's strategic decision to focus his defense on attacking the prosecution's case rather than presenting this evidence to the jury. Indeed, petitioner even appears to concede that counsel was sufficiently aware of all of the information needed to mount the defense he faults counsel for neglecting. See Pet. 15 ("The information regarding the run in Andrews had with the [East Tarboro Boys] was provided to defense counsel within a matter of a few weeks of the shooting. This was a case that begged for a thorough investigation for alternative suspects. Even with no further investigation, trial counsel had ample evidence that he could have presented at trial to create a reasonable [doubt] that Mr. Harper was innocent and that Cherry and Andrews were the real killers."). Counsel directed an independent investigation into the facts and was aware of most, if not all, of the information which petitioner faults counsel for failing to present.[6] Accordingly, it is evident that a fair-minded jurist could conclude that counsel's factual investigation was at least sufficient to support a reasonable strategic decision about the value of undertaking further investigation or whether to present the fruits of the investigation at trial. As such, to the extent the state court determined that counsel was not ineffective in failing to conduct further investigation into evidence of third party shooters, that decision is neither contrary to or an unreasonable application of clearly established federal law, and nor is it based upon an unreasonable determination of the facts before the state court.

This determination brings the court to the crux of petitioner's claim: that counsel was

---

[6] Compare Elmore, 661 F.3d at 863-64 ("The dearth of investigation also distinguishes this case from others where counsel, having conducted some investigation, made an informed decision to pursue another strategy. . . . Because Elmore's lawyers' investigation into the State's forensic evidence never started, there could be no reasonable strategic decision either to stop the investigation or to forgo use of the evidence tha the investigation would have uncovered.").

ineffective not for failing to investigate but, rather, for failing to present the evidence of third party

shooters which counsel had uncovered through his investigation. Accepting that counsel's factual

investigation was reasonable, his decision about what evidence to present ordinarily would be a

matter of trial strategy which the Supreme Court has described as "virtually unchallengeable."

Strickland, 466 U.S. at 690. However, one of counsel's articulated justifications for failing to

present this evidence was his belief that the trial court would find it inadmissible as hearsay. This

rationale implicates another of the Strickland criteria characterizing a "virtually unchallengeable"

strategic decision: the decision must be supported by "thorough investigation of the law" in addition

to the facts underlying the option forsaken by counsel. Id. Petitioner contends that counsel

erroneously believed that Cherry's confession would be inadmissible hearsay if offered through the

testimonies of Murphy and Thigpen, and that counsel did not adequately research this point of law

in deciding to not present the evidence. Pet. 16-18. Ultimately, the court need not determine

whether the statement itself is admissible under North Carolina law because, even assuming that it

could have been, fair-minded jurists could debate whether counsel was reasonable in believing that

the statement would be inadmissible.[7] More fundamentally, however, counsel's professed concern

---

[7] Counsel's professed belief that the statement might be inadmissible hearsay is not easily rebuked under North Carolina law. To be admissible as a hearsay statement against the penal interests of the declarant, "the trial judge must find that corroborating circumstances insure the trustworthiness of the statement." State v. Dewberry, 166 N.C. App. 177, 181, 600 S.E.2d 866, 869 (N.C. Ct. App. 2004). "It is well-settled that the trial court has broad discretion in determining the reliability of the declaration. Factors to be considered include spontaneity, relationship between the accused and the declarant, existence of corroborative evidence, whether or not the declaration had been subsequently repudiated and whether or not the declaration was in fact against the *penal interests* of the declarant." State v. Choudhry, 206 N.C. App. 418, 422-23, 697 S.E.2d 504, 508 (N.C. Ct. App. 2010) (citation and quotations omitted). Counsel reasonably could have believed that the trial court, given its wide discretion to assess the reliability of the statement, would find the statement sufficiently unreliable to exclude it from evidence because the testifying witnesses were
(continued...)

22

about the overall reliability of the statement is supported by the record and therefore confirms that his decision not to attempt to introduce it was a matter of considered and deliberate trial strategy, which is "virtually unchallengeable," rather than a mere faulty judgment resulting from ignorance of the law.

It is important to emphasize here what is the very circumscribed scope of this court's inquiry. This court is not concerned with whether counsel in fact performed deficiently. Rather,

> [t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Williams, *supra*, at 410. A state court must be granted deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

Harrington, 562 U.S. at __, 131 S.Ct. at 785 (emphasis in original); see also id. at 788 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."). Upon reviewing the state court's decision and the evidence before that court, it is apparent that "reasonable argument" that counsel satisfied the Strickland standard abounds. Because "fairminded jurists could disagree that the state court's decision conflicts with" Strickland, petitioner is not entitled to habeas corpus relief. Id. at 786. See also id. at 787 ("As a condition for obtaining habeas

---

[7](...continued)
closely related to petitioner either by kinship (Thigpen) or romantic involvement (Murphy), the intoxicated or impaired state of at least Cherry and Thigpen at the time of the statement, Murphy's apparently wavering confidence in the sincerity of the confession, and the fact that the witnesses chose to correspond with petitioner about the matter rather than alerting law enforcement.

23

corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

Considering the circumstances under which Cherry purportedly confessed his involvement in some shooting at the club,[8] the clear allegiance of the testifying witnesses to petitioner,[9] the fact that some aspects of Cherry's confession did not mesh with physical evidence from the scene, and the fact that the confession did not directly conflict with the inculpatory testimony of any of the State's witnesses, counsel's testimony at the MAR hearing that he was concerned that witness testimonies about Cherry's confession would not be reliable or "believable" is supported by the record. Moreover, as the State court noted, counsel sought to introduce some evidence of multiple shooters, not including petitioner, through the testimony of a witness, Marquise Higgs, whom he regarded as "articulate" and more reliable. MAR Tr. 156-57. Thus, despite strategically opting to forgo testimony from Knight, Murphy, or Thigpen, counsel did not entirely abandon the option of presenting an alternative shooter defense. While it is questionable whether counsel could or should have done more to bolster an alternative shooter defense, such inquiries are not the province of a federal court in habeas review of a state court's judgment on counsel's performance. Harrington, 131 S.Ct. at 788. At any rate, given the concerns articulated by counsel with the evidence he had developed, it is apparent that the limitations he exercised fell within "'the wide latitude counsel must

---

[8] As noted above, Cherry confessed after at a party where he had been drinking. Thigpen testified that she had been using illegal drugs and was "high as hell" at the time.

[9] Again, Thigpen testified that she was a cousin of petitioner's, and Murphy testified that she and petitioner were "more than friends" and had corresponded through letters while petitioner was incarcerated awaiting trial.

24

have in making tactical decisions.'" Cullen, 131 S.Ct. at 1406 (quoting Strickland, 466 U.S. at 689).

In recognizing that counsel's decision was a matter of considered trial strategy, a reasonable argument certainly exists that counsel satisfied Strickland's deficient performance standard. As to prejudice, considering the obvious weaknesses of the witness testimonies about Cherry's confession, it is evident that fair minded jurists could dispute whether the inclusion of such testimony would have made a different result at petitioner's trial substantially likely. See Cullen, 131 S.Ct. At 1403 (showing of prejudice under Strickland "requires a substantial, not just conceivable, likelihood of a different result") (internal quotations omitted).

Based upon all of the above, the State court's conclusion that counsel "made a considered decision not to call Murphy or Thigpen as witnesses" is not an unreasonable determination in light of the facts before the State court. Likewise, the court's ultimate conclusion that counsel's failure to call these witnesses "was not so ineffective as to deny the Defendant his 6th Amendment right to counsel," or that "a different result at trial would not have been reasonably likely had counsel acted as the MAR suggests" is not contrary to or an unreasonable application of clearly established federal law. Accordingly, respondent is entitled to summary judgment on this claim.

C.     Conclusion

The court finds that the state court reasonably applied the Strickland standard to petitioner's claims of ineffective assistance of counsel. As such, petitioner is not entitled to habeas corpus relief and respondent's motion for summary judgment is due to be granted and the petition dismissed.

IV.    Certificate of Appealability

Having determined that respondent is entitled to summary judgment and the petition is due to be dismissed, the court must now consider whether petitioner is entitled to a certificate of

25

appealability. See Rule 11 of the Rules Governing Section 2254 Cases ("Habeas Rules") ("the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). A certificate of appealability may issue only upon a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253 (c)(2). An applicant satisfies this standard by demonstrating that reasonable jurists would find that any assessment of the constitutional claims by the district court is debatable or wrong and that any dispositive procedural ruling by the district court likewise is debatable. See Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003); Slack v. McDaniel, 529 U.S. 473, 484 (2000); Rose v. Lee, 252 F.3d 676, 683-84 (4th Cir. 2001).

After reviewing the petition in light of the applicable standards, the court finds that reasonable jurists would not find the court's treatment of Claim I of the petition, challenging counsel's failure to present evidence to rebut the state's theory of motive, debatable or wrong or that the issue is adequate to deserve encouragement to proceed further. Accordingly, petitioner is not entitled to a certificate of appealability as to Claim I. However, as to Claim II, challenging counsel's failure to present readily available evidence of third party guilty, the court finds that petitioner has satisfied the threshold showing. Accordingly, the court will grant a certificate of appealability as to Claim II.

## CONCLUSION

For the reasons stated above, respondent's motion for summary judgment [D.E. # 5] is GRANTED and the petition is DISMISSED. The court DENIES a certificate of appealability as to Claim One of the petition, but GRANTS a certificate as to Claim II. The clerk of court is DIRECTED to close this case.

SO ORDERED. This the 21 day of September, 2012.

_James C. Fox_
JAMES C. FOX
Senior United States District Judge